IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Regina Z. Muhammad, | ) | C/A No.: 3:12-3298-JFA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Westinghouse Electric Company LLC, | ) | |
| Swager Harrison, Oliver Anderson, | ) | |
| David Baustert, and Dave Precht, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

In this employment discrimination case, Regina Z. Muhammad ("Plaintiff") sues her former employer, Westinghouse Electric Company LLC[1] ("Westinghouse"), alleging religious and sexual harassment, religious-based disparate treatment, and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). Plaintiff also asserts claims of defamation against defendants Swager Harrison, Oliver Anderson, David Baustert, and Dave Precht (collectively "Individual Defendants"), as well as a claim for civil conspiracy against all defendants ("Defendants").

This matter comes before the court on Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). [Entry #6]. The motion having been fully briefed [Entries #11, #14], it is ripe for disposition.

---

[1] In their answers to Local Civil Rule 26.01 interrogatories [Entry #3], Defendants clarified that Westinghouse Electric Company, LLC should be identified as Westinghouse Electric Company LLC.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion to dismiss is dispositive, this report and recommendation is entered for the district judge's consideration.  For the reasons that follow, the undersigned recommends the district court grant Defendants' motion to dismiss, with leave to Plaintiff to file an amended complaint.

I.    Factual and Procedural Background[2]

On or about March 4, 2002, Westinghouse hired Plaintiff at its Columbia, South Carolina facility ("Columbia facility").  [Entry #1-2 at ¶¶ 16–17].  Among other things, Westinghouse manufactures fuel rod pellets for use in the energy industry. *Id* at ¶ 24. Plaintiff alleges that the Individual Defendants were also Westinghouse employees and served as her supervisors and/or managers during all relevant time periods.  *Id.* at ¶ 8–9.

Plaintiff states that until approximately June 12, 2010, she was a CNC operator in Westinghouse's Grid Area.  *Id*. at ¶ 20.  In or around June 2010, Plaintiff bid for a third-shift pellet-line position in the pellet area ("Pellet Line").  *Id*. at ¶¶ 23, 31.  Plaintiff received the position, as did three other employees—Jamie Pittman, Angela Saunders, and Johnny Spivey.  *Id.* at ¶¶ 30–31.  Plaintiff asserts that she is Muslim, whereas Pittman, Saunders, and Spivey are not.  *Id*. at ¶¶ 32–33.

---

[2] To the extent Plaintiff moves to strike [Entry #11 at 1–2] the summary of factual allegations in Defendants' memorandum in support of the motion to dismiss, the undersigned recommends the motion be denied.  The undersigned finds that Defendants accurately summarized the complaint's allegations and satisfied their obligation under Local Civil Rule 7.05(A)(2) (D.S.C.) to provide a concise statement of the facts that pertain to the matter before the court.

Westinghouse's Columbia facility has five Pellet Lines, and each operates the same way. *Id*. at ¶ 25. Each Pellet Line has positions for the following tasks: (a) preparing powder to be pressed into a fuel pellet; (b) pressing powder into fuel pellets; (c) cooking fuel pellets in a furnace; (d) grinding or cutting fuel pellets into the correct diameters; and (e) inspecting fuel pellets for the correct dimensions. *Id*. Allegedly based on representations from the third-shift supervisor Oliver Anderson, Plaintiff believed she would be trained on each of these tasks over a one-and-a-half year period and would ultimately be known as a pellet operator. *Id*. at ¶ 26–27. She alleges that it was Westinghouse's policy for transferred employees to be trained by certified trainers on all of the positions. *Id*. at ¶ 28.

Plaintiff alleges that she and Saunders were assigned to Line 1 on the third shift around June 12, 2010. *Id*. at ¶¶ 30, 38. According to Plaintiff, the team leader/certified trainer on Line 1 was Harrison and the shift supervisor was Anderson. *Id*. at ¶¶ 37, 39. She alleges the two men were good friends. *Id*. at ¶ 48.

Plaintiff contends Harrison asked her if she was Muslim. *Id*. at ¶¶ 37, 41. She asserts that he began attacking her religion by asking whether Muslims were radicals, if they attended church, and if gays existed in their religion. *Id*. at ¶¶ 43, 44. She allegedly told Harrison that he was being offensive and that his questions were discriminatory. *Id*. at ¶ 45. She alleges that although she had worked at Westinghouse for eight-and-a-half years, this was the first conversation about her religion that she had during her employment. *Id*. at ¶ 46. Plaintiff later allegedly wrote Harrison a "peace note," which included details about her faith and advised that she did not want to impose her religion

3

on anyone, but that it was a peaceful one. *Id.* at ¶ 47. She alleges that Harrison accepted the letter. *Id.*

Plaintiff contends that although she thought everything would be okay after she wrote the letter, it was not. *Id.* at ¶ 49. She alleges that Harrison and other team leaders/certified trainers trained Saunders, Pittman, and Spivey, but that she was not trained by a team leader/certified trainer and was told by Anderson that he did not have a qualified trainer to train her. *Id.* at ¶¶ 50–52. Plaintiff alleges that Anderson assigned her to be trained by Lisa Mack, who Plaintiff contends was not a certified trainer. She states that she learned that Mack was not a certified trainer when other employees began questioning her about why Harrison was not training her and why Anderson was not assigning her to a team leader/certified trainer. *Id.* at ¶ 56. Plaintiff alleges the other employees made comments such as "watch your back—they know that you are Muslim," "they are going to give you a hard time because of your religion," and "they are putting you with a trainer they know is not qualified." *Id*. at ¶ 57.

After being assigned to Mack, Plaintiff asked Anderson why she was not being trained by a certified trainer. *Id*. at ¶ 58. She contends that Anderson responded that "sometimes you have to rub elbows with the trainers to be trained," which Plaintiff understood to mean that she would have to give sexual favors to be trained. *Id*. at ¶¶ 58–60. Plaintiff allegedly stated that "she was not going to go there," after which Anderson allegedly told her that Mack was the best person on Pellet Line 1 to train her and to trust his judgment. *Id*. at ¶ 60.

In August 2010, Plaintiff claims she again asked Anderson to assign her to a certified trainer. *Id*. at ¶ 61. She contends that Anderson became defensive and asked why she was questioning his authority. *Id*. at ¶ 62. Thereafter, Plaintiff continued her training with Mack through the end of the month. *Id*. at ¶ 64. She claims she then asked Anderson if she could transfer to first shift to receive certified training. *Id*. at ¶ 65. Anderson allegedly complied with her request and transferred her to first shift to receive additional training. *Id*. at ¶¶ 65–66.

Plaintiff contends that Anderson told the first-shift supervisor Evette (last name unknown, "LNU") that Plaintiff had been trained on the Pellet Line's back-end position ("D&V Inspector"), and that she was only to be trained on the front end (Prep and Press). *Id*. at ¶ 66. Plaintiff received front-end training from Ms. Dot LNU and Cedric LNU from approximately September 2010 until December 2010. *Id*. at ¶ 77. Plaintiff understood that both Ms. Dot and Cedric were certified trainers. *Id*. at ¶ 68. When her training on first shift ended, Plaintiff alleges that she returned to the third shift and Anderson assigned her to be a D&V Inspector. *Id*. at ¶¶ 70–71. Plaintiff contends that Mack was no longer on Line 1 and that she had no one to go to for help. *Id*. at ¶¶ 73–74.

Plaintiff alleges that approximately one month after her return to third shift, Anderson transferred to the first shift and Harrison took over as the third-shift supervisor. *Id*. at ¶¶ 75–76. She alleges she asked Harrison to put her with a qualified trainer and that he refused stating that he had no authority to do so. *Id*. at ¶¶ 77–79. She asserts that Harrison also told her to just "continue to do what she was already doing." *Id*. at ¶ 80.

Plaintiff then approached Anderson and asked to have a meeting with Area Manager Dave Baustert, along with Anderson and Harrison. *Id*. at ¶ 81. The meeting allegedly occurred in or around January 2011. *Id*. at ¶ 81. During the meeting, Plaintiff claims that she asked Baustert, Anderson, and Harrison about Westinghouse's training procedures, and requested certified training. *Id*. at ¶ 82. She asserts that Harrison insisted that he had her best interests in mind, and that he would like for her to work on the front end of the Pellet Line doing prep and press work until he felt comfortable that she was ready to do more training. *Id*. at ¶ 82. Harrison allegedly said he thought Plaintiff would be on the front end for about six months. *Id*. at ¶ 82. Plaintiff contends that Baustert advised that he would provide her a qualified trainer and would be in touch, but that no one ever contacted her about receiving certified training. *Id*. at ¶ 82–83. Plaintiff believed she should have received certified or qualified training on every Pellet Line task as per Westinghouse Policy and could not understand why she did not receive it. *Id*. at ¶¶ 84–86.

Plaintiff contends she worked on the front end of the Pellet Line from approximately January 13, 2011, through February 28, 2011. *Id*. at ¶ 87. During this time, Westinghouse allegedly installed new micrometers on all five Pellet Lines to be used by inspectors working on the back end. *Id*. at ¶ 88.

Harrison allegedly told Plaintiff that effective March 1, 2011, she would work on the back end as a D&V Inspector. *Id*. at ¶ 89. Plaintiff claims she was not trained on the new micrometer and when she started working the back end, she asked for help on how to use it. *Id*. at ¶ 91. Plaintiff alleges that she understood the only difference between the

new micrometer and the old micrometer was that the new one sent the micrometer readings directly into a computer. *Id*. at ¶ 92. She contends that she asked a certified trainer on a different line if she was using the micrometer correctly. Id. at ¶ 93. She claims the certified trainer watched her use the new micrometer and told her she was using it correctly. *Id*. Prior to the new micrometer being installed, Plaintiff alleges she had no disciplinary action, and no one had ever accused her of using the old micrometer machine incorrectly or of submitting bad micrometer readings. *Id*. at ¶ 95.

Plaintiff alleges that on March 8, 2011, she was called to a meeting with Baustert, Anderson, Harrison, and Westinghouse Human Resources Consultant Ryan Stuckey. *Id*. at ¶ 96. During the meeting, Plaintiff was allegedly shown a printout of micrometer readings that she took on March 4 and 7, 2011. *Id*. She claims she was told that she took multiple fuel pellet micrometer readings during a one-second period and that her average time in taking samples was about 2.5 times faster than other employees. *Id*. Plaintiff states she could not explain how she performed multiple readings within a single second, and claimed she operated the micrometer as trained. *Id*. She asserts that she was sent home and suspended with pay pending an investigation. *Id.*

She claims she was interviewed on March 9, 14, and 16, 2012. *Id*. at ¶ 97. She alleges she was told she worked two other shifts where her micrometer data had problems, but she does not believe she was shown that data or told what those shifts were. *Id*. at ¶ 98. On March 18, 2011, Baustert allegedly contacted Plaintiff at home and advised her that she was being terminated. *Id*. at ¶ 100. She received a termination letter dated March 18, 2011, stating that she was terminated for: falsification of records or

reports; violation of safety rules/regulatory compliance, configuration control and/or operating procedures; violation of a number of Westinghouse policies and procedures; and violation of the Westinghouse Code of Business. *Id*. at ¶ 101.

Plaintiff alleges she sought review of her discharge through Westinghouse's Open Door Policy with the Plant Manager, Dave Precht, telling him that she was not aware of any wrongdoing. *Id*. at ¶¶ 103–04. Precht allegedly met Plaintiff around March 25, 2011, and told her there might be a glitch with the micrometer machine because the readings were so abnormal. *Id*. at ¶ 105. He allegedly said there would be an investigation to make sure there was no glitch and that he would speak with Anderson and Harrison. *Id*. at ¶ 105. Plaintiff claims she was not informed of the outcome of the investigation, but her termination was upheld. *Id*. at ¶¶ 105–06.

On August 10, 2012, Plaintiff filed suit in South Carolina state court. [Entry #1-2]. Defendants removed the case to this court on November 16, 2012. [Entry #1].

II.     Discussion

A.     Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court is "not required to accept as true the legal conclusions set forth in a plaintiff's complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Indeed, "[t]he presence of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts

alleged in the complaint cannot support the legal conclusion." *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001).

    B.    Analysis

        1.    Defamation Claim

Plaintiff asserts a claim of defamation against the Individual Defendants. [Entry #1-2 at 20–21]. Defendants contend the claim fails because (1) Plaintiff fails to allege any plausible publication; and (2) any purportedly defamatory statement made by the Individual Defendants would be subject to an intra-corporate privilege. [Entry #6-1 at 8; Entry #14 at 2–5].

To recover for defamation under South Carolina law, the complaining party must show: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm. *Fleming v. Rose*, 567 S.E.2d 857, 860 (S.C. 2002). Defamatory communications can take two forms: libel and slander. Slander is a spoken defamation, while libel is a written defamation or one accomplished by actions or conduct. *Swinton Creek Nursery v. Edisto Farm Credit*, 514 S.E.2d 126, 133–34 (S.C. 1999).

Although Defendants initially asserted that Plaintiff had failed to identify any statement made about her [Entry #6-1 at 9], Plaintiff clarifies that she is asserting that allegedly defamatory statements were contained in her termination letter, wherein she was noted to have been terminated for falsification of records or reports; violation of safety rules/regulatory compliance, configuration control and/or operating procedures;

violation of a number of Westinghouse policies and procedures; and violation of the Westinghouse Code of Business [Entry #11 at 3–4].

The parties disagree over whether the allegedly defamatory statements were published to a third party. Defendants argue that Plaintiff cannot establish publication via her termination letter because she has not alleged that the letter was published to any third party. [Entry #14 at 3]. Plaintiff's complaint alleges that she received the termination letter, but does not allege that it was sent to or viewed by any third parties. [Entry #1-2 at ¶ 101]. Consequently, the undersigned recommends a finding that the existence of the termination letter sent to Plaintiff is insufficient to establish publication to a third party. *See Todd v. Fed. Express Corp.*, No. 4:09-1501, 2012 WL 4006595, at *20 (D.S.C. July 16, 2012), *adopted in relevant part by* 2012 WL 4006466 (D.S.C. Sept. 12, 2012) (finding a purportedly false termination letter was not a publication for defamation purposes where the plaintiff failed to show the letter was shared with third parties).

Plaintiff contends that "Defendants published the defamatory statements about [her] at least between themselves during the course of their investigation." [Entry #11 at 4]. Defendants respond that Plaintiff's argument is speculative and fails as a matter of law because "South Carolina belongs to the group of authorities which adhere to the view that communications between employees of a corporation in the course of their employment [are] not a publication for which the employer is liable." [Entry #14 at 3 (quoting *Payne v. FMC Corp.*, No, 1:90-882-6, 1991 WL 352415, at *6 n.5 (D.S.C. July 12, 1991) (holding that the fact that some of the defendant's corporate management

personnel may have seen a letter sent to the plaintiff withdrawing an offer of employment did not constitute publication of the letter))].  The undersigned agrees that Plaintiff's speculative argument that the Individual Defendants published defamatory statements to each other during their investigation is insufficient to establish publication and recommends a finding that Plaintiff has failed to state a prima facie defamation claim.

Even if Plaintiff could establish publication, Defendants argue an intra-corporate privilege applies because the statements were made between agents and associates of the same corporation.  [Entry #6-1 at 10–11].  South Carolina recognizes a qualified privilege for such communications.  *See Bell v. Evening Post Pub. Co.*, 459 S.E.2d 315, 317 (S.C. Ct. App. 1995).  The elements of the intra-corporate privilege are "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only."  *Id.*  The privilege may be lost, however, "by the manner of its exercise."  *Murray v. Holnam, Inc.*, 542 S.E.2d 743, 749 (S.C. App. 2001).  The person invoking the privilege must not exceed the scope of the occasion, engage in any unnecessary defamation, or act with actual malice.  *Id.* "Actual malice requires that at the time of the defendant's act or omission he was conscious or chargeable with consciousness of his wrongdoing."  *Id.* at 751.  Whether malice is the incentive for a publication is ordinarily for a jury to decide.  *Id.*

Here, Plaintiff alleges actual malice exists, but bases her argument on the allegations that "statements were made with actual or implied malice" and "exceeded the bounds of any qualified or conditional privilege."  [Entry #1-2 at ¶¶ 145, 149].  She has failed to make any factual allegations that would support a finding of actual malice.  The

undersigned recommends a finding that Plaintiff's conclusory allegations are insufficient to overcome the application of the intra-corporate privilege to any statements made by the Individual Defendants.

For the foregoing reasons, the undersigned recommends dismissing Plaintiff's defamation claim against the Individual Defendants.  Plaintiff indicated in her brief that she "intends to move to amend her Complaint to add the corporate Defendant to her Defamation cause of action as well as other facts supporting the elements of this cause of action."  [Entry #11 at 3 n. 2].  The undersigned notes that the allegations in Plaintiff's complaint would likewise be insufficient to state a defamation cause of action against Westinghouse.

### 2.    Civil Conspiracy Claim

Plaintiff asserts a civil conspiracy claim against Defendants.  [Entry #1-2 at 20].  Defendants seek dismissal of the claim, arguing that Plaintiff has failed to allege any legally-cognizable conspiracy against her and has failed to identify any special damages that she suffered as a result of such a conspiracy.  [Entry #6-1 at 12].

 "A civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff."  *McMillan v. Oconee Mem'l Hosp., Inc.*, 626 S.E.2d 884, 886 (S.C. 2006).  "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint."  *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. App. 2009).  In other words, the acts pled in furtherance of the conspiracy must be "separate and independent from other wrongful acts alleged in the complaint, and the

failure to properly plead such acts will merit the dismissal of the claim." *Id.* at 875. "Moreover, because the quiddity of a civil conspiracy claim is the special damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other causes of action." *Id.* at 874.

In support of their motions to dismiss, Defendants first argue that, as an at-will employee, Plaintiff cannot maintain a civil conspiracy claim. [Entry #14 at 5–6]. South Carolina law holds that an at-will employee may not maintain a civil conspiracy action against her employer. *Angus v. Burroughs & Chapin Co.*, 628 S.E.2d 261, 262 (S.C. 2006). Plaintiff contends this argument must be stricken because "[n]owhere in her Complaint does Plaintiff allege that she was an 'at-will' employee." [Entry #11 at 7]. Plaintiff alternatively argues that her Title VII claims against Westinghouse remove her from any at-will employment status. *Id.* Plaintiff's arguments are unavailing.

There is a legal presumption in South Carolina that employees are at-will. *See Nicholson v. Sci. Applications Intern. Corp.*, No. 1:12-2779, 2012 WL 6568399, at *1 (D.S.C. Nov. 27, 2012) (citing *Amason v. P.K. Mgmt., LLC*, No. 10-1752, 2011 WL 1100169, at *6 (D.S.C. Mar. 23, 2011), *adopted by* 2012 WL 6588635 (D.S.C. Dec. 17, 2012). Plaintiff has pled no facts establishing the existence any employment contract beyond the at-will relationship. Furthermore, her contention that her Title VII claims remove her at-will employment status is not grounded in law and, if correct, would result in very few at-will employment relationships, given the number of individuals that fall

within a protected class. For these reasons, the undersigned recommends a finding that Plaintiff cannot maintain a civil conspiracy cause of action against Westinghouse.[3]

Defendants next argue that the Individual Defendants cannot be liable for civil conspiracy because employees acting within the scope of their employment are not liable under a civil conspiracy theory. [Entry #14 at 6]. "[A] civil conspiracy cannot exist when the alleged acts arise in the context of a principal-agent relationship because by virtue of the relationship such acts do not involve separate entities." *McMillan*, 626 S.E.2d at 886–87. Plaintiff responds that she has adequately stated a claim for civil conspiracy by alleging that "[t]he actions of Westinghouse's agents, representatives, and/or employees were negligent, grossly negligent, reckless or willful, among other things. They are personally liable therefore." [Entry #11 at 7; Entry #1-2 at ¶ 140]. Plaintiff contends that it is a reasonable inference to find that "among other things" includes acting outside the scope of their employment. [Entry #11 at 7]. The undersigned does not agree and recommends a finding that Plaintiff has failed to plead facts sufficient to support the legal conclusion that the Individual Defendants were acting outside the scope of their employment. On that basis, the undersigned recommends dismissing the civil conspiracy claim against the Individual Defendants.

Even assuming Plaintiff had a viable civil conspiracy claim against either Westinghouse or the Individual Defendants, she has failed to plead the special damages required for such a claim. "Special damages are those elements of damages that are the

---

[3] The parties did not brief and the court need not determine here whether Plaintiff's at-will employment status also bars her civil conspiracy claims against the Individual Defendants. Those claims are barred by Plaintiff's failure to plead special damages as set forth in more detail herein.

natural, but not the necessary or usual, consequence of the defendant's conduct." *Hackworth*, 682 S.E.2d at 874. "If a plaintiff merely repeats the damages from another claim instead of specifically listing special damages as part of their civil conspiracy claim, their conspiracy claim should be dismissed." *Id.* at 875.

Here, Plaintiff's only attempt to plead special damages is her allegation that she has "suffered special damages, especially the loss of specific employment opportunities." [Entry #1-2 at ¶ 141]. The undersigned concludes that the "loss of specific employment opportunities" could equally arise from Plaintiff's Title VII claims related to her termination. Consequently, the undersigned recommends finding that Plaintiff has failed to plead special damages.[4]

For the foregoing reasons, the undersigned recommends Plaintiff's civil conspiracy be dismissed against Defendants.

### 3.     Title VII Claims

In addition to her state law claims, Plaintiff asserts Title VII claims of sexual harassment, religious discrimination and harassment, and retaliation against Westinghouse.[5]

---

[4] Plaintiff's indication in her response brief that she "intends to amend her Complaint to expound on the special damages she is seeking" [Entry #11 at 5 n.4] is insufficient to save her claim from dismissal. Plaintiff has failed to file any motion to amend the complaint in the nearly six months since filing her response and her failure to do so is telling regarding the existence of special damages to support her claim.

[5] Plaintiff clarifies in her response brief that she is not asserting a claim for gender discrimination. [Entry #11 at 12].

a.    Sexual Harassment Claim

Plaintiff's sexual harassment claim is based on Anderson's alleged statement in summer 2010 that "sometimes you have to rub elbows with the trainers to be trained." [Entry #1-2 at ¶ 58].  Plaintiff claims she understood the statement to mean that she would have to give sexual favors to be trained.  *Id.* at ¶ 60.

In the Fourth Circuit, sexual harassment claims may be categorized into two categories: (1) harassment that creates a hostile work environment, and (2) *quid pro quo* harassment, where sexual consideration is demanded in exchange for job benefits.  *See Katz v. Dole*, 709 F.2d 251, 254 (4th Cir. 1983).  Both categories require a showing that Plaintiff was subject to unwelcome sexual advances.  *See Reinhold v. Commonwealth of Va.*, 135 F.3d 920, 931 (4th Cir. 1998) (holding that an essential element of a *quid pro quo* claim is unwelcome sexual harassment and an essential element of a hostile work environment claim is unwelcome sexual conduct), *vacated on other grounds by* 151 F.3d 172 (4th Cir. 1998).

Defendants argue that Plaintiff's complaint fails under either theory because Anderson's comment cannot reasonably be construed as being sexually driven.  [Entry #6-1 at 18].  The undersigned agrees and recommends a finding that the rubbing-elbows comment cannot objectively be considered to be sexual in nature.  *See EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 327–28 (4th Cir. 2010) (holding in the context of a hostile work environment claim that "[t]o be actionable, sexual harassment must be objectively hostile or abusive, and the victim must subjectively perceive it as such") (citations omitted).  There is nothing in the comment or the circumstances

surrounding the comment that would lead a reasonable person to interpret it as a demand for sexual favors. Furthermore, a hostile work environment requires that the harassment be so severe and pervasive that it alters the conditions of employment and creates an abusive working environment. *See Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir. 2008) (setting forth the elements of sex-based hostile work environment claim). The undersigned does not find the single comment by Anderson to rise to the level of being severe or pervasive. For these reasons, the undersigned recommends Plaintiff's sexual harassment claim be dismissed. Because Plaintiff's sexual harassment claim fails on the merits, the undersigned declines to address whether the claim is also time-barred.

b.      Religious Harassment Claim

Plaintiff also asserts a religion-based hostile work environment claim based on a conversation with Harrison in June 2010 during which he asked her if she was Muslim and asked whether Muslims were radicals, if they attended church, and if gays existed in their religion. [Entry #1-2 at ¶¶ 37, 41, 43–44]. To establish a prima facie hostile work environment claim, Plaintiff must demonstrate that the harassment was (1) unwelcome, (2) because of religion, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313 (4th Cir. 2008).

Defendants contend Plaintiff has not set forth sufficient facts to establish the conduct she complains of was severe or pervasive. [Entry #6-1 at 26]. To establish that the conduct was severe or pervasive, Plaintiff must show that the work environment was not only subjectively hostile, but also objectively so. *See Sunbelt Rentals, Inc.*, 521 F.3d

at 315.  Such proof depends upon the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  "[C]omplaints premised on nothing more than 'rude treatment by [coworkers],' *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006), 'callous behavior by [one's] superiors,' *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or 'a routine difference of opinion and personality conflict with [one's] supervisor,' *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), are not actionable under Title VII."  *Id.* at 315–16.

Here, Plaintiff's allegations do not demonstrate the type of severe and pervasive conduct that would alter the terms of her employment.  Plaintiff has not shown than any of the alleged actions were physically threatening or unreasonably interfered with her work. At most, Plaintiff has alleged that, on a single occasion, her supervisor asked her questions about her religion that she subjectively found offensive.  Therefore, the undersigned recommends Defendants' motion to dismiss be granted as to Plaintiff's hostile work environment claim.

### c.     Religious Discrimination Claim

Plaintiff next asserts a claim of religious discrimination against Westinghouse. She alleges that unlike her non-Muslim co-workers, she was not given qualified/certified training.  [Entry #1-2 at ¶¶ 121–23].  To establish a prima facie case of discrimination under Title VII, Plaintiff must show (1) membership in a protected class; (2) satisfactory

job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Services, LLC*, 375 F.3d 288, 295 (4th Cir. 2004); *see also Booth v. Maryland*, 337 F. App'x 301, 309 (4th Cir. July 21, 2009) (applying the prima facie test to a Title VII claim for disparate treatment based on religion).

Defendant contends Plaintiff cannot establish that she suffered an adverse employment action. [Entry #6-1 at 27]. "A typical adverse employment action includes discharge, demotion, decrease in compensation, loss of job title or supervisory responsibility, reduced opportunities for promotion, or other conduct that had a significant detrimental effect." *Gurganus v. Beneficial N.C., Inc.*, 25 Fed. Appx. 110, 112 (4th Cir. 2001) (citing *Boone v. Goldin*, 178 F.3d 253, 255–56 (4th Cir. 1999)). An adverse employment action often has an economic effect; however, that is not a requirement. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Here, Plaintiff contends the adverse employment action was a denial of certified training. [Entry #11 at 11]. Although she appears to argue in her complaint that the lack of training led to her difficulty using the new micrometer and ultimately to her termination, she states in her response brief that the reasonable inference from the facts is that she used the micrometer correctly and that there was a glitch in the new machine that resulted in abnormal readings. *Id.* at 12. The abnormal readings resulted in her termination. [Entry #1-2 at ¶¶ 96–101]. Thus, it is evident from Plaintiff's argument that the alleged lack of training did not result in her termination. Plaintiff has failed to identify any tangible harm resulting from her alleged denial of certified training. In

addition, her lack-of-certified-training argument is contradicted by her own allegations of having received certified training on first shift and of being told by a certified trainer that she was operating the micrometer correctly.  *Id.* at ¶¶ 67–68, 93.  Because Plaintiff has failed to adequately plead an adverse employment action in support of her discrimination claim, the undersigned recommends the claim be dismissed.

d.    Retaliation Claims

Finally, Plaintiff asserts claims of retaliation based on sex and religion.  To state a prima facie case of Title VII retaliation, Plaintiff must show: (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action at the hands of her employer; and (3) that there existed a causal connection between the protected activity and the adverse action.  *See Bryant v. Aiken Reg'l Med. Ctrs.*, 333 F.3d 536, 543 (4th Cir. 2003).  To establish that she engaged in protected activity, Plaintiff must show (1) that she subjectively believed that Westinghouse had violated Title VII, and (2) that the belief was objectively reasonable.  *See Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003).

In support of her sex-based retaliation claim, Plaintiff asserts that she engaged in protected activity when, in response to Anderson's rubbing-elbows comment, she stated "that she was not going to go there."  [Entry #1-2 at ¶ 60].  In light of the prior recommendation that the rubbing-elbows comment is not objectively sexual in nature, the undersigned recommends finding that Plaintiff's belief that her response was protected activity is not objectively reasonable.  Consequently, the undersigned recommends that Plaintiff's sex-based retaliation claim be dismissed.

With regard to Plaintiff's religion-based retaliation claim, Defendants argue Plaintiff has not established a causal connection between the protected activity and the adverse employment action. [Entry #6-1 at 28]. Plaintiff's claim is based on her conversation with Harrison in June 2010, during which he asked her questions regarding the Muslim faith that she found to be offensive. Defendants do not challenge the protected activity, but contend that the conversation occurred too far in advance of Plaintiff's termination to establish a causal connection. *Id.* Plaintiff responds that she is pleading lack of certified training as the adverse employment action, rather than her termination. [Entry #11 at 9–10]. Although Plaintiff contends that the training was central to her duties, she has failed to assert any allegations demonstrating that to be the case. As stated above, she has failed to identify any tangible harm resulting from her alleged lack of certified training and has admitted to having received at least some training from certified trainers. For these reasons, the undersigned concludes Plaintiff's alleged lack of training is not an adverse employment action.

Plaintiff alternatively argues that if her termination were the only adverse employment action for purposes of her retaliation claim, then the court should look to the intervening period between her conversation with Harrison and her termination to establish a causal connection. [Entry #11 at 10]. Plaintiff's previously-referenced argument that she was terminated because of a glitch in the micrometer [Entry #11 at 12] negates her contention that her termination was retaliatory in nature. Furthermore, the length of time between Harrison's comments and Plaintiff's termination negates an inference of causation based on time. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 278

(4th Cir. 2001) (finding a six-month lag is sufficient to negate any inference of causation based on time).

For these reasons, the undersigned recommends dismissal of Plaintiff's retaliation claims for failure to state a claim.

## III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendants' motion to dismiss [Entry #6] be granted.   However, Fourth Circuit precedent constrains[6] the undersigned to recommend that the dismissal of Plaintiff's claims be without prejudice with leave to file an amended complaint within 15 days of the district court's order on Defendants' motion to dismiss.  *See Ostrenski v. Seigel*, 177 F.3d 245, 252–53 (4th Cir. 1999) (recognizing that rather than dismiss a defective pleading with prejudice, a plaintiff should "be given every opportunity to cure a formal defect in his pleading[,] . . . even though the court doubts that plaintiff will be able to overcome the defects").  If Plaintiff were to fail to file an amended complaint within 15 days of the district court's order on the motion to dismiss, the undersigned recommends the district judge dismiss this action in its entirety with prejudice.

---

[6] In her response, Plaintiff's counsel repeatedly references an intention to amend the complaint to include allegations to support her Plaintiff's claims.  [Entry #11 at 3 n.2, 5 n.4].  She also seeks leave to amend in the event she failed to plead sufficient facts.  *Id.* at 5, 13.  Counsel is expected to know the law and the pleading requirements thereunder.  It should not fall to the court to identify her failures.  To the extent Plaintiff files an amended complaint that includes claims that are not sufficiently pled, such claims will be recommended for dismissal with prejudice.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

June 13, 2013                                      Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge


**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).