IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Regina Z. Muhammad, | C/A No. 3:12-cv-03298-JFA |
| Plaintiff, | |
| vs. | |
| Westinghouse Electric Company LLC, Swager Harrison, Oliver Anderson, David Baustert, and Dave Precht, | **Order** |
| Defendants. | |

In this employment discrimination case, Regina Z. Muhammad ("Plaintiff") has filed suit against her former employer, Westinghouse Electric Company LLC ("Westinghouse"), asserting claims of religious and sexual harassment, religious-based disparate treatment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). Plaintiff also asserts a claim of civil conspiracy against Westinghouse and four Westinghouse employees, Swager Harrison, Oliver Anderson, David Baustert, and Dave Precht ("Individual Defendants"), as well as a claim of defamation against those Individual Defendants.

In accordance with 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g), D.S.C., the case was referred to the Magistrate Judge for pretrial handling.[1] Before the Magistrate Judge, Westinghouse and the Individual Defendants (collectively "Defendants") moved to dismiss Plaintiff's claims pursuant to Rule 12(b)(6) of the Fed. R. Civ. P. ECF No. 6, which is the motion currently before this court. On June 13, 2013, the Magistrate Judge issued a Report and Recommendation ("Report") wherein she recommends that this court grant

---

[1] The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261 (1976).

Defendants' motion to dismiss. ECF No. 16. Plaintiff filed objections to the Report, to which Defendants replied. ECF Nos. 24, 27. Thus, this matter is ripe for the court's review. The court is charged with making a *de novo* determination of those portions of the Report to which specific objections are made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b)(1). For the reasons set forth below, this court grants in part and rejects in part Defendants' motion to dismiss.

## I. Factual Background

Around March 4, 2002, Westinghouse hired Plaintiff for work at its facility in Columbia, South Carolina. Among other things, Westinghouse manufactures fuel rod pellets for use in the energy industry. According to the complaint, the Individual Defendants were Westinghouse employees as well as Plaintiff's supervisors and/or managers during the relevant time periods.

Until around June 12, 2010, Plaintiff was a CNC operator in Westinghouse's grid area. Around June 2010, she sought a third-shift pellet-line position in Westinghouse's pellet area ("Pellet Line"). Plaintiff received the position, as did three other employees—Jamie Pittman, Angela Saunders, and Johnny Spivey. According to the complaint, Plaintiff is Muslim, whereas Pittman, Saunders, and Spivey are not.

Westinghouse has five Pellet Lines in its Columbia facility, and each operates the same way. Each Pellet Line has positions for: (1) preparing powder to be pressed into a fuel pellet; (2) pressing powder into fuel pellets; (3) cooking fuel pellets in a furnace; (4) grinding or cutting fuel pellets into the correct diameters; and (5) inspecting fuel pellets for the correct dimensions.

According to the complaint, Plaintiff understood that she would be trained on each of these tasks over a one-and-a-half year period and ultimately would be known as a pellet operator.

Plaintiff states that she based this understanding on representations from the third-shift supervisor Anderson, as well as on her understanding of Westinghouse's policy to train transferred employees on all of the positions using certified trainers.

Plaintiff and Saunders were assigned to Pellet Line 1 on the third shift around June 12, 2010, according to the complaint. Plaintiff states that Harrison was the team leader/certified trainer on Pellet Line 1 and that Anderson was the shift supervisor. According to the complaint, Plaintiff believes that Harrison and Anderson were good friends.

In her complaint, Plaintiff states that Harrison asked her if she was Muslim, and that he attacked her religion by asking whether Muslims were radicals, if they attended church, and if gays existed in their religion. Plaintiff told Harrison that he was being offensive and that his questions were discriminatory. Though she had worked at Westinghouse for eight-and-a-half years, this was Plaintiff's first conversation about her religion that she had had during her employment, according to the complaint. Plaintiff states that she later wrote Harrison a "peace note," including details about her faith, and advising him that she did not want to impose her religion on anyone and that her religion was peaceful. She states that Harrison accepted the letter. Although Plaintiff thought everything was okay after she wrote the letter, Plaintiff contends that it was not.

In her complaint, Plaintiff states that Harrison and other certified trainers/team leaders trained Saunders, Pittman, and Spivey, but not her. Plaintiff holds the belief that there was one certified trainer/team leader for each of the five Pellet Lines. Plaintiff states that Anderson told her he did not have a qualified trainer to train her. Instead, Anderson assigned her to Lisa Mack, who Plaintiff contends was not a certified trainer. Plaintiff states that she learned that Mack was not a certified trainer when other employees began asking her why Harrison was not training her

and why Anderson was not assigning her to a team leader/certified trainer. According to the complaint, the other employees made comments such as "watch your back—they know that you are Muslim," "they are going to give you a hard time because of your religion," and "they are putting you with a trainer they know is not qualified."

After being assigned to Mack, Plaintiff asked Anderson why a certified trainer was not training her, according to the complaint. Plaintiff also states that Anderson responded that, "sometimes you have to rub elbows with the trainers to be trained." This comment Plaintiff understood to mean that she would have to give sexual favors to be trained, according to the complaint. In response, Plaintiff said that "she was not going to go there," according to the complaint. The complaint describes how Anderson told her that Mack was the best person on Pellet Line 1 to train her and to trust his judgment.

In August 2010, Plaintiff again asked Anderson to assign her to a certified trainer, according to the complaint. Plaintiff contends that Anderson became defensive and asked why she was questioning his authority. Thereafter, Plaintiff continued her training with Mack through the end of the month, according to the complaint. Plaintiff states that she then asked Anderson if she could transfer to first shift to receive certified training. Anderson complied with her request and transferred her to first shift to receive additional training.

According to the complaint, Plaintiff believes that Anderson told the first-shift supervisor Evette (last name unknown, "LNU") that Plaintiff had been trained on the Pellet Line's back-end position ("D&V Inspector"), and that she was to be trained only on the front end (Prep and Press). Plaintiff received front-end training from Ms. Dot LNU and Cedric LNU from around September 2010 until December 2010. According to the complaint, Plaintiff understood that both Ms. Dot and Cedric were certified trainers.

When her training on first shift ended, Plaintiff states that she returned to the third shift and that Anderson assigned her to be a D&V Inspector. Plaintiff contends in her complaint that Mack was no longer on Pellet Line 1 and that Plaintiff had no one to turn to for help. About one month after Plaintiff's return to the third shift, Anderson transferred to the first shift and Harrison took over as the third-shift supervisor, according to the complaint. Plaintiff contends that she asked Harrison to put her with a qualified trainer, but that Harrison refused, stating that he had no authority to do so. In her complaint, Plaintiff also asserts that Harrison told her just to "continue to do what she was already doing."

According to the complaint, Plaintiff then approached Anderson and asked to meet with the area manager, Dave Baustert, as well as with Anderson and Harrison. The meeting occurred around January 2011. Plaintiff states in her complaint that she asked Baustert, Anderson, and Harrison about Westinghouse's training procedures during the meeting and that she requested certified training. According to the complaint, Harrison insisted that he had Plaintiff's best interests in mind, and that he would like for her to work on the front end of the Pellet Line doing Prep and Press until he felt comfortable that she was ready to do more training. The complaint states that Harrison said he thought Plaintiff would be on the front end for about six months. In the complaint, Plaintiff contends that Baustert advised her during the meeting that he would provide her a qualified trainer and would be in touch. Plaintiff states that no one ever contacted her about receiving more certified training. Additionally, Plaintiff states that she believed she should have received certified or qualified training on every Pellet Line task pursuant to Westinghouse policy and that she could not understand why she did not.

Plaintiff worked on the front end of the Pellet Line from around January 13, 2011, through February 28, 2011, according to the complaint. During this time, Westinghouse

installed new micrometers on all five Pellet Lines to be used by inspectors working on the back end, according to the complaint. In the complaint, Plaintiff states that Harrison told her she would start working on the back end as a D&V Inspector on March 1, 2011, which Plaintiff asserts was sooner than what had been stated at the meeting earlier in the year.

In her complaint, Plaintiff submits that she received no training on the new micrometer, and that, once she started working on the back end, she asked for help on how to use it. Plaintiff further states that she understood the only difference between the new micrometer and the old micrometer was that the new one sent the micrometer readings directly into a computer. Plaintiff states that she asked a certified trainer on a different Pellet Line if Plaintiff was using the micrometer correctly. Plaintiff also contends that the certified trainer watched her use the new micrometer and told Plaintiff that she was using it correctly. In her complaint, Plaintiff submits that she had no disciplinary action before Westinghouse installed the new micrometer, and that no one ever had accused her of using the old micrometer machine incorrectly or of submitting bad micrometer readings.

According to the complaint, Baustert, Anderson, Harrison, as well as Westinghouse Human Resources Consultant Ryan Stuckey called Plaintiff to a meeting on March 8, 2011. During the meeting, Plaintiff states that she was shown a printout of micrometer readings that she took on March 4 and March 7, 2011. Plaintiff contends that she was told that she took multiple fuel pellet micrometer readings during a one-second period and that her average time in taking samples was about 2.5 times faster than other employees. Plaintiff states in the complaint that she could not explain how she performed multiple readings within a single second, and that she told them she operated the micrometer as trained. Plaintiff further states that she was sent home and subsequently suspended with pay pending an investigation.

In the complaint, Plaintiff states that she was interviewed on March 9, March 14, and March 16, 2011. She submits that she was told of two other shifts during which her micrometer data had problems, but that she does not believe she was shown that data or told what those shifts were. On March 18, 2011, according to the complaint, Baustert contacted Plaintiff at home and advised her that she was being terminated. According to the complaint, Plaintiff received a termination letter dated March 18, 2011, stating that she was terminated for: falsification of records or reports; violation of safety rules/regulatory compliance, configuration control and/or operating procedures; violation of a number of Westinghouse policies and procedures; and violation of the Westinghouse Code of Business.

In the complaint, Plaintiff states that she sought review of her discharge with the plant manager, Dave Precht, through a Westinghouse open door policy, telling Precht that she was not aware of any wrongdoing on her part. The complaint states that Precht met with Plaintiff around March 25, 2011, and that he told Plaintiff that there might be a glitch with the new micrometer machine because the readings were so abnormal. According to the complaint, Precht said an investigation would ensue to make sure there was no glitch and that he would speak with Anderson and Harrison. Plaintiff states that she was not informed of the outcome of the investigation, but that her termination was upheld.

On August 10, 2012, Plaintiff filed suit in South Carolina state court. ECF Nos. 1–2. Defendants removed the case to this court on November 16, 2012. ECF No. 1.

## II.    Legal Standard

When considering a 12(b)(6) motion to dismiss, the court must accept as true the facts alleged in the complaint and view them in a light most favorable to Plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999). However, "[t]o survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Accordingly, Plaintiff must put forth claims that cross "the line from conceivable to plausible." *Id.* at 570.

## III.    Analysis

A district court determines *de novo* the portions of a magistrate judge's report and recommendation to which a party has submitted a proper objection. *See* Fed. R. Civ. P. 27(b)(3). If a party fails to properly object because the objections lack the requisite specificity, the court need not conduct a *de novo* review. *See Brooks v. James*, No. 2:10–2010–MBS, 2011 WL 4543994, at *2 (D.S.C. Sept. 30, 2011); *Veney v. Astrue*, 539 F. Supp. 2d 841, 846 (W.D. Va. 2008). In the absence of a proper objection, the court must "'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (internal citation omitted); *see also Thomas v. Arn*, 474 U.S. 140, 148–53 (1985).

In the matter before this court, Plaintiff has filed numerous objections, challenging the Report's application of law to Plaintiff's claims of defamation, civil conspiracy, and harassment

and retaliation under Title VII. Although some of the objections do little more than repeat assertions in the record, this court will go through them in order.[2]

### A.  Defamation

The Magistrate Judge suggests that Plaintiff has failed to make out a prima facie case of defamation because Plaintiff produced no evidence to show that the Individual Defendants published any alleged defamatory statement to a third party. Even assuming Plaintiff had established publication, the Magistrate Judge is of the opinion that an intra-corporate privilege applies because any alleged defamatory statements among the Individual Defendants would have been made between agents and associates of the same corporation.

To recover for defamation under South Carolina law, the complaining party must show that: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm. *Fleming v. Rose*, 567 S.E.2d 857, 860 (S.C. 2002). Defamatory communications can take two forms: libel and slander. Slander is a spoken defamation, whereas libel is a written defamation or one accomplished by actions or conduct. *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 514 S.E.2d 126, 133–34 (S.C. 1999).

In her first objection, Plaintiff challenges the Magistrate Judge's recommendation that Plaintiff did not and cannot establish publication. Specifically, Plaintiff challenges the Magistrate Judge's suggestion that a termination letter sent to Plaintiff is insufficient to establish

---

[2] The Report sets forth in detail relevant case law for each of Plaintiff's causes of action, and the court incorporates such without recitation.

publication to a third party.[3]  Plaintiff argues that the letter illustrates the particular statements that the Individual Defendants made, which Plaintiff claims impugned Plaintiff and constituted defamation.  Plaintiff also asserts that those statements are defamatory *per se* because they charged Plaintiff with unfitness in her business or profession.  Additionally, Plaintiff challenges the Magistrate Judge's finding that it is speculative whether defamatory statements were made among the Individual Defendants in the course of their investigation.  Plaintiff argues that her claim for defamation is not speculative because facts Plaintiff presented in her complaint are sufficient for the claim to survive a motion to dismiss.  In support of this argument, Plaintiff cites to portions of her complaint that describe the Individual Defendants' investigation of Plaintiff's work performance.

Plaintiff's arguments are unavailing for three reasons.  First, as noted by the Magistrate Judge, a purportedly false termination letter does not constitute publication for defamation purposes when, as here, Plaintiff has failed to show in her pleadings that the letter was shared with third parties.  *See Todd v. Fed. Express Corp.*, No. 4:09–1501–TLW–KDW, 2012 WL 4006595, at *20 (D.S.C. July 16, 2012), *adopted in relevant part*, 2012 WL 4006466 (D.S.C. Sept. 12, 2012).  Second, Plaintiff's argument that her claim for defamation is not speculative merely restates portions of her complaint, which is an objection that does not rise to the level of specificity for a *de novo* review.  Third, for reasons stated below, Plaintiff's argument fails as a matter of law because an intra-corporate privilege applies to any alleged defamatory statements among the Individual Defendants.

---

[3] In her response to Defendants' motion to dismiss, Plaintiff clarified that she is asserting that her termination letter contained the allegedly defamatory statements.  ECF No. 11, pp. 3–4. The termination letter noted that Plaintiff was terminated for falsification of records or reports; violation of safety rules/regulatory compliance, configuration control and/or operating procedures; violation of a number of Westinghouse policies and procedures; and violation of the Westinghouse Code of Business.  *Id.*

In her second objection, Plaintiff challenges the Magistrate Judge's suggestion that an intra-corporate privilege applies even assuming that Plaintiff had established publication. Plaintiff argues that the intra-corporate privilege is an affirmative defense that should have been presented in an answer, citing Rule 8(c) of the Fed. R. Civ. P. Therefore, Plaintiff submits that Defendants' intra-corporate privilege argument was improperly before this court.

This court agrees that the intra-corporate privilege is an affirmative defense that ordinarily should be asserted in an answer. However, the court also allows such a defense in a motion to dismiss under Rule 12(b) of the Fed. R. Civ. P., "when there is no disputed issue of fact raised by an affirmative defense, or the facts are completely disclosed on the face of the pleadings, and realistically nothing further can be developed by pretrial discovery or a trial on the issue raised by the defense." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* § 1277 (3d ed. 2004). Even though a Rule 12(b)(6) motion to dismiss "invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996).

Here, the Magistrate Judge properly concludes that an intra-corporate privilege applied. Plaintiff's complaint states that the Individual Defendants made defamatory comments during the course of a work-related investigation of Plaintiff's job performance. Thus, the complaint on its face shows the existence of an affirmative defense and, therefore, properly is before this court in Defendants' motion to dismiss.

In her third objection, assuming the qualified privilege applies, Plaintiff challenges the Magistrate Judge's suggestion that the assertions made in Plaintiff's complaint are conclusory on

the issue of malice and insufficient to rebut the intra-corporate privilege attached to any statements made by the Individual Defendants. Specifically, Plaintiff argues that the Report incorrectly applies the law on qualified privilege to the facts of this case, and that the Report omits numerous facts that would support Plaintiff's argument that the privilege either does not apply or was lost. In support of this argument, Plaintiff cites portions of her complaint as proof that the Individual Defendants either did not act in good faith or acted with common law actual malice, thereby exceeding the scope of the qualified privilege.

This court finds that the Magistrate Judge properly sets out the elements of the intra-corporate privilege in the Report as good faith, "an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *See Bell v. Evening Post Pub. Co.*, 459 S.E.2d 315, 317 (S.C. Ct. App. 1995). The privilege may be lost, however, "by the manner of its exercise." *Murray v. Holnam, Inc.*, 542 S.E.2d 743, 749 (S.C. Ct. App. 2001). The person invoking the privilege must not exceed the scope of the occasion, engage in any unnecessary defamation, or act with actual malice. *Id.* "Actual malice requires that at the time of the defendant's act or omission he was conscious or chargeable with consciousness of his wrongdoing." *Id.* at 751. Whether malice is the incentive for a publication is ordinarily for a jury to decide. *Id.*

Based on these standards of law, the Magistrate Judge is of the opinion that Plaintiff alleges actual malice on the part of the Individual Defendants, but suggests that Plaintiff fails to make any factual allegations that would support a finding of actual malice. In support, the Magistrate Judge points to Plaintiff's assertions in the complaint that "statements were made with actual or implied malice" and "exceeded the bounds of any qualified or conditional privilege." The court agrees with the Magistrate Judge. These conclusory statements are

insufficient to overcome the intra-corporate privilege that attached to the communication among the Individual Defendants. This court also does not find any factual assertions on the record that would suggest another conclusion. Additionally, Plaintiff's objections to the Report merely recite the same factual allegations presented in the complaint. Thus, this court finds that the Magistrate Judge's Report properly applies the law on qualified privilege and weighs the facts in the record.

Accordingly, this court overrules the objections that Plaintiff has raised about the Magistrate Judge's recommendation on the defamation claim and adopts the Report as modified.

**B.    Civil Conspiracy**

The Magistrate Judge suggests that Plaintiff has failed to plead facts sufficient to support a civil conspiracy claim against Westinghouse and the Individual Defendants. Specifically, the Magistrate Judge recommends dismissal of Plaintiff's civil conspiracy claim for three reasons. First, the Magistrate Judge is of the opinion that Plaintiff, as an at-will employee, cannot maintain a civil conspiracy action against Westinghouse, as her employer. Second, the Magistrate Judge submits that Plaintiff has failed to plead facts sufficient to support the legal conclusion that the Individual Defendants were acting outside the scope of their employment, as necessary for individual liability. Third, even assuming that Plaintiff had a viable civil conspiracy claim against either Westinghouse or the Individual Defendants, the Magistrate Judge suggests that Plaintiff has failed to plead the special damages required for such a claim.

As properly set out in the Report, "[a] civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff." *McMillan v. Oconee Mem'l Hosp., Inc.*, 626 S.E.2d 884, 886 (S.C. 2006). "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other

claims within the complaint." *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. Ct. App. 2009). In other words, the acts pled in furtherance of the conspiracy must be "separate and independent from other wrongful acts alleged in the complaint, and the failure to properly plead such acts will merit the dismissal of the claim." *Id.* at 875. "Moreover, because the quiddity of a civil conspiracy claim is the special damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other causes of action." *Id.* at 874.

In her first objection to the Report's recommendations on civil conspiracy, Plaintiff argues that Plaintiff's claim against Westinghouse is permissible even if Plaintiff is an at-will employee. Plaintiff acknowledges that an at-will employee may not maintain a civil conspiracy action against her employer for a termination. *See Angus v. Burroughs & Chapin Co.*, 628 S.E.2d 261 (S.C. 2006) ("*Angus II*"). However, citing *Reed v. Aiken Cnty.*, No. 1:09–1744–MBS, 2010 WL 2985805 (D.S.C. July 26, 2010), Plaintiff argues that a civil conspiracy claim is viable for an at-will employee when the conspiracy to injure goes beyond termination.

This court agrees with Plaintiff that *Reed* stands for the principle that an at-will employee in a narrow set of circumstances may pursue a civil conspiracy claim against an employer arising out of harm other than termination. *Reed*, 2010 WL 2985805, at *3; *see also Faile v. Lancaster Cnty.*, S.C., 0:11–2206–CMC, 2013 WL 786447 (D.S.C. Mar. 1, 2013) ("[A] civil conspiracy claim by an at-will employee against an employer *arising out of the employee's termination* is barred" by *Ross v. Life Ins. Co. of Va.*, 259 S.E.2d 814 (S.C. 1979), *Angus v. Burroughs & Chapin Co.,* 596 S.E.2d 67 (S.C. Ct. App. 2004), and *Angus II*.). Based on that principle, the viability of Plaintiff's claim would turn on what she pled in terms of conspiracy to injure. However, this court finds that Plaintiff has made no factual allegations in furtherance of the

conspiracy that are separate and independent from other wrongful acts alleged in her complaint. Therefore, this court finds *Reed* inapplicable.

Plaintiff also challenges the Magistrate Judge's finding that Plaintiff remains an at-will employee for purposes of civil conspiracy, despite her claims of Title VII violations. To support her argument, Plaintiff points to a citation and a footnote in *Reed*.[4] This court agrees with the Magistrate Judge that this argument is not grounded in law, and Plaintiff's assertion that the language in *Reed* somehow supports her argument is meritless. Thus, the Magistrate Judge properly concluded that Plaintiff cannot maintain a civil conspiracy action against Westinghouse.

In her second objection, Plaintiff argues that she has sufficiently shown that the Individual Defendants acted beyond the scope of their employment, thereby subjecting them to individual liability for civil conspiracy.

As properly noted by the Magistrate Judge, South Carolina courts recognize an exception to civil conspiracy liability when all the alleged conspirators are agents of one corporate entity and act on behalf of that corporate entity. *See McMillan*, 626 S.E.2d at 886–87. Acknowledging this intra-corporate immunity, Plaintiff nonetheless argues that her case is similar to *Anthony v. Ward*, 336 Fed. Appx. 311 (4th Cir. 2009). In *Anthony*, the Fourth Circuit Court of Appeals considered personal motives[5] as relevant in determining whether employees acted outside the

---

[4] *Reed* cites *Culler v. Blue Ridge Elec. Co-op., Inc.*, 422 S.E.2d 91, 92 (S.C. 1992) with the following explanatory parenthetical: "('The doctrine [of employment at will] in its pure form allows an employer to discharge an employee without incurring liability for good reason, no reason, or bad reason.')." In an accompanying footnote, the *Reed* court states: "However, an employer is precluded by Title VII and other statutes from terminating an employee for a discriminatory reason." *Reed*, 2010 WL 2985805, at *3, n.1 (citing *Owen v. Carpenters' Dist. Council*, 161 F.3d 767, 773 (4th Cir. 1998).

[5] The evidence in *Anthony* provided that one defendant disliked the plaintiff because he refused to violate company procedure; one defendant acted against the plaintiff's interests because he refused to testify negatively about another employee; all the defendants acted contrary to

scope of their employment for purposes of civil conspiracy. *Id.* at 316–17. Based on *Anthony*, Plaintiff argues that the facts of her case, or reasonable inferences from those facts, show that the Individual Defendants acted outside the scope of employment by providing other employees with certified training, but not her. This court agrees with Plaintiff that circumstantial evidence may support a finding of personal motive or actions beyond the scope of employment. However, unlike in *Anthony*, this court finds that Plaintiff has failed to plead facts sufficient to support the legal conclusion that the Individual Defendants' actions were personally motivated.

In her final objection to the Report's recommendations on civil conspiracy, Plaintiff argues that her pleadings included the special damages required for such a claim. As set out by the Magistrate Judge, "[s]pecial damages are those elements of damages that are the natural, but not the necessary or usual, consequence of the defendant's conduct." *Hackworth*, 682 S.E.2d at 875. "If a plaintiff merely repeats the damages from another claim instead of specifically listing special damages as part of their civil conspiracy claim, their conspiracy claim should be dismissed." *Id.*

In support of her objection, Plaintiff points to *Reed v. Town of Williston*, No. 1:08–2451, 2009 WL 821304 (D.S.C. Jan. 27, 2009), in which a Magistrate Judge recommended denying the defendants' Rule 12(c) motion to dismiss the plaintiff's civil conspiracy claim. However, as noted by Defendants in their response to Plaintiff's objections, the sufficiency of special damages was not at issue in that decision. *Id.* Thus, this court overrules Plaintiff's objection.

Accordingly, this court overrules the objections that Plaintiff has raised about the Magistrate Judge's recommendation on the civil conspiracy claim and adopts the Report.

---

longstanding custom in their treatment of the plaintiff regarding a particular matter; and other comparable employees were treated more favorably. *Anthony, 336 Fed. Appx.* at 316.

## C.    Title VII

Plaintiff asserts Title VII claims of sexual harassment, religious discrimination and harassment, and retaliation against Westinghouse.[6]  In her response to the Magistrate Judge's Report, Plaintiff raises numerous objections, and this court will address them in order.

### 1.    Sexual harassment

The Magistrate Judge suggests that Plaintiff has failed to meet the prima facie requirements for a sexual harassment claim under Title VII.  Specifically, the Magistrate Judge is of the opinion that Plaintiff's sexual harassment claim fails because Anderson's comment— "sometimes you have to rub elbows with the trainers to be trained"—objectively cannot be considered sexual in nature.  Also, the Magistrate Judge submits that the single comment by Anderson does not rise to the level of being severe or pervasive.

In the Fourth Circuit, sexual harassment claims fall into two categories: (1) harassment that creates a hostile work environment, and (2) quid pro quo harassment, where sexual consideration is demanded in exchange for job benefits.  *See Katz v. Dole*, 709 F.2d 251, 254 (4th Cir. 1983).  Both categories require a showing that Plaintiff was subject to unwelcome sexual advances.  *See Reinhold v. Commonwealth of Va.*, 135 F.3d 920, 931 (4th Cir. 1998) (holding that an essential element of a quid pro quo claim is unwelcome sexual advances and an essential element of a hostile work environment claim is unwelcome sexual conduct), *vacated on other grounds,* 151 F.3d 172 (4th Cir. 1998); *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 327–28 (4th Cir. 2010) ("To be actionable, sexual harassment must be objectively hostile or abusive, and the victim must subjectively perceive it as such.") (internal citations omitted).

---

[6] In her response to Defendants' motion to dismiss, Plaintiff states that she is not asserting a claim for gender discrimination.  ECF No. 11, p. 12.

Furthermore, a hostile work environment requires that the harassment be so severe and pervasive that it alters the conditions of employment and creates an abusive working environment. *See Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir. 2008) (setting forth the elements of sex-based hostile work environment claim).

In her objection, Plaintiff argues that the Magistrate Judge failed to consider the totality of circumstances when she concluded that Anderson's rubbing-elbows comment was not objectively sexual in nature and that any harassment was not severe and pervasive. This court disagrees. The Magistrate Judge makes it clear that she found nothing in the comment *or the circumstances surrounding the comment* that would lead a reasonable person to interpret it as a demand for sexual favors. Beyond this specific challenge, Plaintiff merely restates the allegations asserted in her complaint. Accordingly, this court overrules the objection as to sexual harassment and adopts the Report.

2.      Religious harassment

The Magistrate Judge is of the opinion that Plaintiff's allegations do not make out a prima facie case of religious harassment against Westinghouse. Plaintiff bases her claim on the conversation with Harrison during which he asked her if she was Muslim, and asked whether Muslims were radicals, if they attended church, and if gays existed in their religion. In light of this conversation, the Magistrate Judge suggests that Plaintiff's assertions do not demonstrate the type of severe and pervasive conduct that would alter the terms of her employment. Additionally, the Magistrate Judge contends that Plaintiff has not shown that any of the alleged actions either were physically threatening or unreasonably interfered with her work. At most, the Magistrate Judge opines, Plaintiff has alleged that, on a single occasion, her supervisor asked her questions about Islam that Plaintiff subjectively found offensive.

To establish a prima facie hostile work environment claim, Plaintiff must demonstrate that the harassment was (1) unwelcome, (2) because of religion, (3) sufficiently severe or pervasive to alter conditions of employment and create an abusive atmosphere, and (4) imputable to the employer. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313 (4th Cir. 2008). To establish that the conduct was severe or pervasive, Plaintiff must show a subjectively and objectively hostile work environment. *Id.* at 315.

The Magistrate Judge properly sets out that such proof depends on the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 23 (1993)). The Report takes inventory of cases in which the Fourth Circuit found that Title VII claims were not actionable, including mere rude treatment by coworkers, callous behavior by superiors, or routine difference of opinion and personality conflict with a supervisor.

In her objection, Plaintiff nonetheless argues that the Magistrate Judge failed to consider the totality of circumstances when she concluded that Defendants' conduct was not severe and pervasive and did not alter the terms of her employment. To support this argument, however, Plaintiff merely reiterates conclusory assertions made in her complaint. Without more, Plaintiff's argument is unavailing, and this court overrules the objection and adopts the Report.

3.      Religious discrimination

The Magistrate Judge suggests that Plaintiff has not met the requirements for a prima facie case of religious discrimination. Specifically, the Magistrate Judge proposes that Plaintiff has failed to plead an adverse employment action as required for the claim. While Plaintiff argues that denial of certified training was the adverse employment action, the Magistrate Judge

submits that Plaintiff herself states that the abnormal readings of the micrometers resulted in her termination.[7]  Thus, the Magistrate Judge suggests that Plaintiff has failed to identify any tangible harm resulting from any denial of certified training.

To establish a prima facie case of discrimination under Title VII, Plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment.  *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004); *see also Booth v. Md.*, 337 F. Appx. 301, 308–09 (4th Cir. 2009) (applying the prima facie test to a Title VII claim for disparate treatment based on religion).

Plaintiff alleges that, unlike her non-Muslim co-workers, Westinghouse did not provide her with qualified/certified training.  In her objection, Plaintiff insists that her lack of training resulted in her termination; that she identified tangible harm resulting from the denial of certified training; and that she suffered an adverse employment action.

To support her arguments, Plaintiff submits that her argument regarding the glitch in the new machine was misconstrued.  Plaintiff also argues that the Magistrate Judge failed to consider two of Westinghouse's reasons for discharging Plaintiff: "1) violation of safety rules/regulatory compliance, configuration control and/or operating procedures; and, 2) violation of a number of Westinghouse policies and procedures."  ECF No. 24, p. 24.  Plaintiff contends that the two reasons show that Westinghouse fired Plaintiff for not following operating procedures in using

---

[7] In her response to Defendants' motion to dismiss, Plaintiff acknowledges that she asked for help on one occasion and was told that she was using the micrometer correctly.  Further, she states:  "However, the reasonable inference is that Plaintiff, in fact, used the micrometer correctly and that there was a 'glitch' with the new micrometer machine because the readings were so abnormal (as Defendant Precht represented to Plaintiff when she sought his review of her termination through the company's Open Door Policy)."  ECF No. 11, pp. 11–12.

the micrometer on which she states she had no training.  This, Plaintiff argues, translates into the lack of training being an adverse employment action.

It is clear that Plaintiff was dissatisfied with her lack of training, but that fact alone does not constitute adverse employment action.  The question is whether the lack of training had a significant detrimental effect on her.  *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (discussing "tangible employment action" as trigger for employer's strict liability under Title VII for supervisor's discriminatory acts)).  While this court agrees with the Magistrate Judge that Plaintiff has alleged that she used the new micrometer correctly and that the glitch was the cause of her termination, this court sustains Plaintiff's objection nonetheless.  Accepting as true the facts alleged and viewing them in a light most favorable to Plaintiff, this court denies Defendants' motion to dismiss as to religious discrimination.

3.    Retaliation

The Magistrate Judge recommends dismissing Plaintiff's claims of sex- and religion-based retaliation.  Specifically, as to the sex-based retaliation claim, the Magistrate Judge suggests that Plaintiff has failed to show that her response was protected activity in light of the prior recommendation that the rubbing-elbows comment is not objectively sexual in nature.  With regard to the religion-based retaliation claim, the Magistrate Judge is of the opinion that Plaintiff has failed to establish a causal connection between the conversation about Islam and her termination.  In any event, the Magistrate Judge suggests that Plaintiff's assertion that she was terminated because of a glitch in the micrometer negates any contention that her termination was retaliatory in nature.  Additionally, the Magistrate Judge rejects Plaintiff's argument that the lack of certified training was the adverse employment action, rather than her termination.  Although

Plaintiff contends that the training was central to her duties, the Magistrate Judge is of the opinion that she has failed to assert any allegations demonstrating that to be the case.

To state a prima facie case of Title VII retaliation, Plaintiff must show: (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action at the hands of her employer; and (3) that a causal connection existed between the protected activity and the adverse action. *See Bryant v. Aiken Reg'l Med. Ctrs.*, 333 F.3d 536, 543 (4th Cir. 2003).

To establish that she engaged in protected activity, Plaintiff must show (1) that she subjectively believed that Westinghouse had violated Title VII, and (2) that the belief was objectively reasonable. *See Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003).

Additional, to establish denial of training as an adverse employment action, Plaintiff must show that the training was central to her duties. *Bunch v. Caldera*, 00–CV–1142, 2001 WL 34366089, at *5 (E.D. Va. Jan. 16, 2001), *aff'd*, 15 F. App'x 43 (4th Cir. 2001).

In her objection to the Magistrate Judge's recommendation on the sex-based retaliation claim, Plaintiff merely references her argument regarding her sexual harassment claim. Thus, this court overrules the objection without further consideration.

As to the religion-based retaliation claim, Plaintiff objects on two grounds. First, Plaintiff argues that the Magistrate Judge erred when she concluded that Plaintiff's lack of training was not central to her duties for purposes of establishing an adverse employment action. Second, Plaintiff contends that the Magistrate Judge incorrectly concluded that Plaintiff failed to identify any tangible harm resulting from the denial of certified training.

This court agrees with the Magistrate Judge that Plaintiff has failed to establish a causal connection between the conversation about Islam and her termination. However, accepting as true the facts alleged and viewing them in a light most favorable to Plaintiff, this court sustains

Plaintiff's objections to the Report.  Thus, the court grants Defendants' motion to dismiss as to sex-based retaliation and denies the motion as to religion-based retaliation.

IV.     **Conclusion**

After a careful review of the record, the applicable law, the Report, and the objections thereto, this court adopts the Magistrate Judge's Report as modified.  Accordingly, the court grants in part and rejects in part Defendants' motion to dismiss.  This court hereby dismisses without prejudice Plaintiff's claims of defamation; civil conspiracy; religious harassment under Title VII; and sexual harassment and retaliation under Title VII.  The Clerk of Court shall return the file of this case to the Magistrate Judge for further handling.

IT IS SO ORDERED.

*Joseph F. Anderson, Jr.*

September 30, 2013                                           Joseph F. Anderson, Jr.
Columbia, South Carolina                               United States District Judge